Good morning. May I please the court. I'm Carrie Rosenbaum on behalf of the petitioner Jose Mock Carlos Zumel. I'd like to reserve five minutes please. You may do so. Thank you. This is an appeal from a final decision of the Board of Immigration Appeals. There are two main issues before the court on this record today. The first is the Board of Immigration Appeals violation of the clearly erroneous standard for review of an immigration judge's factual findings regarding an essential element in the terrorism statute, the element of intent. Contrary to the regulations, thus necessitating remand to the Board of Immigration Appeals or to the immigration judge for additional fact-finding. The second issue is the significance of the Philippine government's grant of amnesty to petitioner Zumel, eliminating the unlawfulness under the terrorism statute such that this court must grant the petition for review because petitioner is a government resident and not subject to the terrorism bar. This Board made a fundamental error, or sorry, this Board, not this Board, Your Honors. The Board of Immigration Appeals made a fundamental error when it disregarded the immigration judge's factual findings regarding the issue of intent and engaged in de novo fact-finding contrary to the regulations. Sotomayor Let me ask you about that, because our circuit, we look at facts in the courts. We look at facts. And I didn't see that the BIA disputed any of the historical facts that were found by the immigration judge. It was only the legal analysis to take from that, like whether it showed intent or not. And so that seemed to me under our case law, Ramadan and other cases, to be a mixed question of fact and law. And so was there any dispute about the historical facts, that the BIA found historical facts differently than the IJ? I think Rador v. Holder is absolutely on point in this case, because the Court specifically said, gluing the two questions together, factual findings and applications Excuse me. Which case is on point? Rador v. Holder, 696F3906. I haven't. That gluing the two questions together, the factual finding and application of law, does not entitle the Board to review the first question, the factual one de novo, and that it must break down the inquiry into its parts and apply the correct standard of review to the respective components. So that's So what were the factual findings, the findings of historical facts where the BIA made a different historical fact-finding as opposed to the legal conclusion to draw from that? The immigration judge at pages 283 to 284 of the record specifically said, with respect to the 1989 events, which were the main events addressed by the Board, none of Zemel's substantial testimony aided the DHS in establishing it was the intent of Respondent or Altas to endanger the safety of individuals or cause substantial damage to property. So if intent is a legal conclusion to draw from the facts as opposed to historical fact, in other words, an intent is something that we determine based on the historical facts. So my question was, what historical facts? In other words, the IJ said this took a year, and the BIA said, no, I've reviewed the record, I think it took two years. I mean, that would be a historical fact as opposed to intent, which is a legal conclusion. Some of the other facts that I believe are more along the lines of what you're referring to, Your Honor, would be page 284, where the immigration judge said that the evidence was not at all clear, that the intent was to cause substantial property damage. The only clear intent demonstrated was to take bases away, and that the acts of Altas promoted a peaceful surrender. That's at page 284. Okay. So that, again, focuses on intent. So your argument really is the IJ determined that there was a, based on the facts and the evidence in the record, that the terrorist organization or the Altas had an intent, did not have an intent of some sort, and the BIA determined that that organization did have an intent. Is that the only factual dispute that you're actually focusing on? Well, the factual dispute is with respect to intent primarily, yes. Okay. But the whole case hinges on that. And I believe that's the case. And I don't think that's a clear explanation or a legal conclusion based on the statute. Is that your argument? That's correct, Your Honor. And Rador also said, the Court in Rador also said, if the BIA found clear error in the IJ's evidentiary basis for his finding, it surely did not reveal what that error was. Instead, it appears to have relied simply on its own interpretation of the facts, which is not clear error review. And the same has occurred here as well. The Board did not make any assessment of the IJ's factual findings and simply made a conclusory statement, the underlying intent of the plotters is undisputed, and that's not a clear error. That's not, you know, the Board did not use the words, the immigration judge clearly erred. The BIA said, and the IJ, I think it was undisputed that the ALTAS group or that group, organization, intended to overthrow the then-existing government. And as part of that in 1989 was to take over two Air Force bases and that they were armed. And those facts were undisputed. And the BIA said, based on that, I think this meets or I determine this meets the legal standard for intent to endanger because putting these facts together, there's no other intent that could be determined. So as a matter of law, this constitutes intent to endanger. That's how I read the BIA's determination. Now, why is that mistaken? Is there a case that would tell me intent in this statute is a factual conclusion? I don't think that there's a case, Your Honor, a published opinion that I'm aware of that says that. But I do think this case is similar to Rador in that there's a factual and a legal component that are being conflated and that the Board was required to specifically look at the immigration judge's factual findings, which she went to great lengths to make and based her decision about intent on those factual findings. And it is, again, those factual findings that the Board entirely disregarded. It's okay for the Board to come to a different conclusion if they apply the correct standard of review and say the immigration judge's findings were clearly erroneous. That would be acceptable. But that's not what the Board did, which is a violation of the regulations and of the court's decision. If intent is a factual conclusion. If that component of assessing intent, yes, is a factual conclusion. Yes. The BIA simply stated at page 133 of the record, participants intended to use factual findings all in one sentence, again, without referencing the immigration judge's findings. This isn't simply a matter of the immigration judge and the Board weighing the evidence differently, which was also at issue in Rador at pages 914 to 916 of that decision. Counsel, if you're finished on that point, I'm interested in the amnesty. And to what extent can we entertain the relevance of the amnesty to our statutes? Was the amnesty a total amnesty with respect to Philippine law? And if so, what effect does that have on the statute here? Yes, Your Honor. The statute is clear that the government can choose to make their case that the acts were unlawful under the laws of the United States if the acts have been committed here or under the laws of the Philippines according to the laws of the Philippines. And the statute, the terrorism bar, is only triggered if one of the two are met. And as you're likely aware, the question of unlawful under U.S. law was not raised before the Board, so that question is not before the court. The question, as you noted, was whether or not this Court essentially has to give deference to the Philippine government's amnesty. And the Philippine government did indeed grant amnesty in 1995. And in the eyes of the Philippine government, that amnesty eliminated any unlawfulness because we have diplomatic relations with the Philippines to suggest a need for comedy. So can you remind me, did their language in the amnesty say that the acts were not unlawful? What's relevant is that the position of the Philippine government is that the amnesty retroactively eliminated any unlawfulness. What were the words? Did they say it was not unlawful, or how did they phrase that? If you could remind me. There is an advisory opinion of a Philippine justice at page 912 and 917 of the record that indicates that according to the Philippine government, any unlawfulness was completely eradicated by the amnesty. And the words of the amnesty? I guess I'm not remembering. The words of the amnesty itself. The words of the amnesty are fairly concise. They state that he was granted amnesty. But the question before the Court is. It was granted amnesty for acts constituting rebellion, coup d'etat committed during the period of 1986 to 1994. So that's the whole 6-year period. That's correct, Your Honor. Those are the words of the amnesty. But. So in other words, the acts, it doesn't say those acts weren't unlawful. They just get amnesty for them. Is that correct? The amnesty document itself states exactly what you have indicated it states. Yes. However, the Philippine government has indicated, for example, at page 691 there's a statement from the Department of Interior that he, that Petitioner Zumel served with honor and distinction. The acts were committed in the furtherance of political beliefs covered by the Geneva Convention. It is indicated clearly in the record that the Philippine government's position is that he should be in a position of someone who never committed these acts, that the amnesty is retroactive. And the question before the Court is whether or not the Philippine government considers the acts to be unlawful. And the Philippine government has made it clear that they do not consider the acts to be unlawful. They have gone out of their way in support of Petitioner Zumel to provide him documents throughout the case of these proceedings, suggesting that they do not want him to have any negative outcome of the things that occurred in the Philippines at the time in question. This case is also unique in that in most cases where the Department of Homeland Security alleges that a terrorism-related inadmissibility ground applies, the country in question won't have granted an amnesty to that individual. The person in question won't likely have remained an honorable member of the military for, in this case, I believe it was 45 years, and been honorably discharged with a full pension. Petitioner Zumel today still has a full pension. Sotomayor, though, the statute doesn't point us to the individual. The statute points us to the activities of the organization. Isn't that right? It says it's a definition of terrorist activity, and it says an activity which is unlawful under the laws of the place, and then he's a person who engaged in the terrorist activity. I'm sorry. I don't understand the question, Your Honor. So the question is whether the activity of the organization was unlawful under the laws of the place. Right. And this also gets back to this question of intent that's so critical, because someone had to have intended to engage in terrorist activity. He was alleged under small Roman numeral 3, large Roman numeral 5B, terrorist activity, the use of any explosive firearm, et cetera, with intent to endanger or cause substantial property damage. So, again, I think the important issue is that this case isn't properly before this Court and should be remanded for a clean record so that these substantive issues can be considered more appropriately. Counsel, you might want to rest at this moment and reserve your time, and we'll hear from the other side. Thank you, Your Honor. May it please the Court. I'm Mark Walters, representing the Attorney General. If the Court can consider the challenge to the lack of a clear error finding, and I don't think it can because that's not an issue that was briefed, rather it's been presented in a 28J letter for the first time, the Court should rule in the government's favor. In this case, the only reason the Court should ever think of remanding the case for a clear error determination is if the Court intends to require a magic phrase, clear error, because the key word, clear, was used in the opinion below. In the administrative record on page 133, the Board twice uses the word clear. It said it's clear that the purpose of the coup plotters was to force the Aquino government from power, and critically, it's clear from the record that the board found it clear that they intended to endanger others. And the law only requires that the endangerment be directly or indirectly, and clearly this case meets the indirect endangerment requirement, but I think it's also clearly a direct endangerment when you march toward military facilities fully armed. Counsel, this case gives me some real concern. We're not dealing with Khalid Sheikh Mohammed here. We're dealing with a Philippine Air Force general who participated, obviously, in a coup attempt with others over 20 years ago, for which acts he has now been given total amnesty by the Philippine government, which, according to the record, indicates that it has no further — it wipes out everything that occurred with respect to that time. Why does the Attorney General want to go after this person? He's already an LPR. He's got a daughter living in this country. What's going on here? Well, Your Honor, I can only say that this is done as a matter of routine when we're talking about people who are involved in terrorist activity or persecutors or others who may, in fact, not be threats to the United States and may, in fact, one time have been allied with the United States or serving someone who was, a government who was. The most extreme example, of course, is the Nazis, many of whom, the remaining ones are in their 80s or 90s, and they are still not welcome here under our law. In this case, if you commit terrorist activity, it doesn't matter how long ago, and this Court's own opinions, like I think the Kahn and Anacami cases, I can't remember which one, but one of them goes back to 1977. So this Court's own opinions have affirmed closing the door to people involved in these activities. Have any Nazis been prosecuted under this particular provision in this case? I don't think so, Your Honor. There are statutes. Therefore, what you explain doesn't seem to have much relevance. Well, except that in immigration law, my point is a broader one, Your Honor, that in immigration law, there are examples, many, of individuals who did something decades ago, were involved in something decades ago, and we've chosen not to be a haven for them. I do not have the evidence in this record that this person is seeking a haven for something that happened 20 years ago for which he's now been forgiven. Well, he has applied for lawful permanent resident status and was granted it erroneously. I don't think — I think I understand, Your Honor, to be using the word haven as a safe — a place of safety, and perhaps that was my fault. You're the one that raised the question of haven. I did. I was — the point I'm trying to make is that we are not willing, in most instances like this, to be a place where somebody can live out their retirement years if they were involved in such activity. So Mr. Zumel may not be in danger from anyone in the Philippines anymore. Or here. Or here. But this is the law. And so there's not an exception for time having passed for good conduct since the grant of amnesty. There's not even an exception for a grant of amnesty. And, in fact, there are countries that are sponsors of terrorist activity, state sponsors of terrorist activity, where not only would you maybe not be convicted, you wouldn't be prosecuted, you wouldn't be investigated, you wouldn't get amnesty, you might get a reward. So — and yet the conduct might still be unlawful in that country. Congress, though, didn't intend another government's decision regarding whether it will prosecute someone to be the answer to whether you get to come to the U.S. and defeat the terrorist bar, or it wouldn't have put unlawful in the U.S. had it been committed here as an alternative way to prove up the bar. Well, now, in this case, as I understand it from counsel, the question of whether this violated U.S. law or was terrorism within the meaning of U.S. law was not before the BIA. That's right. The Board could have ruled on that basis, but no one did. But it did not. And it's not before this Court. Right. So the only issue before the Court is what happened under Philippine law. That's correct, Your Honor. And so I — Doesn't the amnesty take care of that? Well, the amnesty defines his relationship with the Philippines, but it doesn't define his relationship here or somehow make the actions that were undertaken lawful when they were undertaken. The amnesty itself was granted on condition that he lay down his weapons and the given amnesty, lay down their weapons and cease hostility. So this is not an amnesty recognizing innocence. Also, the amnesty documents refer to what was done as a crime, as rebellion and coup d'etat. And the letter from — the presidential letter that was in the record that he brought to the U.S. on one of his trips here says he has ceased to be a rightist terrorist. So none of those documents suggest it wasn't a violation of Philippine law. The U.S. What about page 916, which is the letter from the associate justice retired Philippine court? The amnesty granted has completely erased the legal consequences of the acts committed by General Zimel and his group in pursuit of political ends. What's your interpretation of that? Well, he also says in that letter that what was done was illegal. So his assessment of Philippine law is that what was done was illegal. I don't think that Congress — and, again, I know that the unlawful if committed in the U.S. provision is not directly before the court. I mention it only to point out that it's a clear indicator of congressional intent that the — both the laws and the application of those laws by a foreign government is not to be twisted in this way to absolve somebody from the U.S. consequences of their actions. Congress didn't intend that. And I don't think there's error in either — the I.J. found that it was unlawful, and so did the board. There was agreement on this, and that the amnesty was not a we-got-it-wrong amnesty. It was more like a rehabilitative amnesty. If you're willing to lay down your weapons and cease hostilities, we will not follow up and prosecute you under our law. I don't think the U.S. government has to recognize that in determining whether he did, in fact, commit terrorist activity. And I think the precedent set, if we went that record, would have serious consequences in failed states for people coming from failed states who — But the Philippines is a longstanding ally of this country. That's right. And so this is not a failed state. Thanks to the forces that opposed General Zumala, it's not a failed state, although maybe they would have set up something that ended up being a successful state. But it was very destabilizing, what happened. And the U.S. government does not have to turn a blind eye to what occurred, which clearly was terrorist activity. What I'm hearing you say is the amnesty wipes out the legal consequences of the activity, but if you still viewed that activity under the law, it would still be unlawful. It was still unlawful. But he didn't have to even face a trial. Obviously wasn't convicted, but then in your opinions, in Khan and Anakame, those individuals weren't convicted in their home countries, and yet we looked at their conduct there and barred them. But the real reach of the argument, if it is accepted, is — I mean, let's not look at failed states. Let's look at countries that were and continue to be our allies, like the Philippines and Central America, for example. Reconciliation commissions have been set up in parts of the world where, unlike here, their democracy or their prevailing government is not that secure. They may have a little bit of a — to deal with threats all the time. These commissions frequently wipe out the offenses that were committed against that but also under the terrorist bar. The difference here is this may be the first case where we've seen an amnesty in a case to reach a court of appeals and, of course, the Supreme Court. But it's not really that much different from countries choosing not to exercise — well, to exercise prosecutorial discretion and not go after somebody, nor is it much different from a country that celebrates terrorist activity and wouldn't go after them. We would still apply the bar if we could. Unless the Court has questions, I'll — I do have a question about the — moving on to the BIA's disagreement with the IJ on the question of intent. And if I understood your argument correctly, you're saying that it's a factual matter and that the BIA implicitly held that IJ's findings were clearly erroneous. Is that a correct statement of your argument? I'm saying — it's almost, Your Honor. I'm saying if it is a factual matter — and I apologize because I don't know the case law well enough to either confirm or dispute what Your Honor said earlier about it being a mixed question of law and fact. But if it is a factual matter, purely factual matter, the Board didn't use the magic phrase clearly erroneous, but we know they thought it was erroneous because they reversed it. And we know they thought it was clear because they said on page 133, it's clear from the record that the participants intended to and did use weapons to endanger others. I don't think we should — the Court should require the magic phrase, if it can discern as I think we can, that it applied the right standard. Do we have any cases suggesting that? I know after the BIA made regulations saying it won't redo the IJ's fact-finding, though it has a clear error obligation. And I'm not aware of any cases where we've followed this implicit determination. I'm not aware of a case where the Court said you must use the magic words, but I'm also not aware of a Ninth Circuit case that said that you don't have to. I'm making this argument because I think it is the logical way to approach reviewing what the Board did here. And I think there can be no doubt that they thought it was clear and that they thought it was an error. But those words are not married together in any sentence in this opinion. Anything further, counsel? No, Your Honor. Very well. We will now hear from Ms. Rosenbaum. You have some reserve time. First, on the issue of intent, it's not waived, Your Honors. In the Alcraz v. Holder case, this Court determined that an issue first raised in a 28J letter need not be waived. And the combination of that case and the Rodriguez v. Holder case suggests where the Board clearly errors and violates the regulations, an issue is not waived. And manifest injustice, as was the case in Alcraz, would result if this Court found the issue was waived. On the effect of the amnesty, to jump to that, page 784 and pages 915 and 923 all discuss the effect of the amnesty. It's irrelevant if — sorry, Your Honors. There's a lot to address now. So the issue before this Court is clearly only whether or not the amnesty eradicated unlawfulness under Philippine law. Because DHS did not make the argument in their BIA briefs or previously that the acts should be considered unlawful under U.S. law, does not permit the Court to conflate the two, as Oyl is suggesting, and determine that there's some way to find that the should be unlawful here, which is how I'm understanding. Well, maybe I should have asked Mr. Walters, what is the evidence in this record that there was a violation of Philippine law? In other words, the — Well, the amnesty — Apparently, he may have been relying on a passage in that letter from the justice, from the Philippine justice. He may have, Your Honor. I don't have that handy at the moment, but — But you know what's in the record. What's the strongest argument on their side, if you don't mind my asking you — Sure. — to establish that there was a violation of Philippine law? The amnesty refers to acts of rebellion and coup d'etat. However, the effect of the amnesty at page 923 says, Amnesty under this proclamation shall extinguish any criminal liability for acts committed in pursuit of a political belief without prejudice to the grantee's civil liability or injuries, et cetera, et cetera. I mean, extinguishing liability for a crime is not the same as saying that it wasn't a crime in the first place. I think that's the point Opposing Counsel was making. Yes, Your Honor. However, the effect of the amnesty is also described at page 915. Amnesty looks backward and abolishes and puts into oblivion the offense itself. It overlooks and obliterates the offense and the offender, and the grantee of amnesty stands before the law precisely as though he has committed no offense. Right. So the individual has not committed an offense, but that doesn't make it not an offense. I mean, I think that was the point the government was making. Yes. However, the Philippine government's position at this time is that there was no unlawfulness. It's not unlawful as of now. And what's the – is the – you're relying on the language from the retired justice for that? Yes. And the others. Is there anything else where they say the rebellion, the coup d'etat, were in fact not unlawful? I guess Opposing Counsel is saying it wasn't – that the government didn't say we got it wrong, and in fact that was never – they're innocent and that was never unlawful under our laws, only that they're forgiven for their offenses. Is that wrong? DHS never filed proof of any charges. And based on the record, the Philippine government's made clear that the acts were not deemed unlawful. I'm not sure if that answered your question, Your Honor. Oyl also referred to the Kahn case to suggest that there was no conviction there, but I would like to raise the Court's attention to the fact that there was also no amnesty in that case. But are you saying that there has to be a conviction, because the statute – I know that was in your brief, but the statute doesn't require a conviction of an individual, only says the acts have to be unlawful, the activity has to be unlawful? That's correct. However, in the Kahn case, there was no amnesty, which clearly indicates that there is no unlawfulness. The Kahn case, I would suggest, is just simply not relevant because the amnesty changes the factual context entirely. The immigration judge also made factual findings that I'd like to refer the Court back to at page 283 regarding intent. And I think it's critical that the Court not determine that the Board of Immigration Appeals references to clearly unlawful or clear intent. This is really identical to the Rador case, page 916, where the Board rejected the IJ's Catt ruling in a single largely conclusory paragraph that essentially recited general conclusions of the Board, did not address most of the IJ's specific factual findings, nor the evidence underlying the findings. The same is true here with respect to the reason why this case must be remanded to the Board or the IJ. Anything further, counsel? One moment, please, if I may, Your Honor. Counsel for the government also suggested that the amnesty did not, did not state that Petitioner Zumel is innocent. However, that's not the significance of the amnesty. The amnesty in the eyes of the Philippine government renders him in a position where he has not violated Philippine law. So the question is not his innocence. It's the position of the Philippine government in the eyes of the Philippine government in adjudicating their own law and determining the impact of their own law. Is there any further evidence in the record with respect to the violation of Philippine law? I do not believe there's any other evidence in the record suggesting that there was a violation of Philippine law. The opposing counsel says that the IJ and the BIA both found that it was unlawful at the time that the coup, the attempted coup and the attempt to overthrow the government was unlawful. Is that wrong? I believe that the finding was wrong because the board and the immigration judge essentially did what counsel for the government suggesting be done here, which is conflate this determination of unlawfulness under U.S. law with unlawfulness in the eyes of the Philippine government. So under the Philippines' law at the time of, in 1989, a coup would have been lawful activity, an attempted coup? Is that your position? My position is that if the Philippine government is now saying there is no unlawfulness, which they have said, then it's not unlawful under Philippine law. It could be unlawful under U.S. law if the government wanted to charge that and then pursue proof of that, and the court could indeed, you know, hypothetically find that. But in this case, on these facts and in this record, I do not believe it's possible to find unlawfulness. And the statute is already incredibly broad, as we all well know. And to read out the requirements of intent and lawfulness would really be illogical and contrary to Congress's intent. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision.
judges: O'scannlain, Ikuta, Teilborg